UNITED STATES v. The JOSHUA LEVINESS. See Case No. 7,549.

## Case No. 15,498a.

UNITED STATES v. The JOSIE et al.

[N. Y. Times, April 11, 1864.]

District Court, S. D. New York. 1864.

COMMERCE WITH INSURRECTIONARY STATES—FORFEITURES—CONSTRUCTION OF STATUTE.

[The act of July 13, 1861 (12 Stat. 255), is to be construed as positively prohibiting citizens or residents alike in the loyal and insurrectionary states from all commercial intercourse and dealing with a view to reciprocity of gains, or in manifestation of feelings of amity and aid towards each other, whether in acts of material support or friendly encouragement to the enemy. Property intended to be used to these ends and the vehicle employed to convey it, either gratuitously or for profit, are alike subject to confiscation. The absolute culpability of the property is independent of all questions of contraband or blockade, or of the intrinsic value or adaptation to belligerent uses of the articles to be interchanged, or the degree of progress made in completing the object of the parties.]

This was a libel of information filed under the act of congress of July 13, 1861, which provides that "all goods and chattels, wares and merchandise coming from an insurrectionary state or section into the other parts of the United States, and all proceeding to such state or section by land or water, shall, together with the vessel or vehicle conveying the same, be forfeited to the United States." The Josie was a small steamer, formerly called the "Eagle." She was captured in an attempt to break the blockade, condemned by the district court of Florida, brought here, and sold at public auction; Joseph Eneas, of this city, becoming her purchaser. He put some repairs on her, put a cargo on board, and cleared her for Havana. Before she left the port, however, she was seized, and these proceedings were commenced against her and her cargo. Her cargo was principally potatoes, apples and cabbages. There was, however, on board, some cases of dry goods and liquors, and a light wagon and harness. The government gave evidence by which they endeavored to show that these goods were the property of a man named J. Howard Wagnon, and that he was a resident of Alabama; while the claimant gave evidence to show that Wagnon was a resident of Nassau, and that the goods were the property of the claimant, paid for by him on Wagnon's order, and to be delivered to him at Nassau, on his paying the price. There was also found on board in the chest of the steward some Masonic books directed to a resident of Charleston, S. C., and a witness was called who testified that he gave them to the steward to carry to their address, and that the steward told him the steamer was going to run the blockade. The steward was not called as a witness by either party, but there was evidence that he had left the vessel after her seizure with custom house officers, and had not been seen since. There was also found in the valise of Craig, the assistant engineer, a small piece of merino cloth for a baby's dress, with a letter addressed to a man named Conley at Montgomery, Ala., unsigned, but stating that the writer had "concluded to send some merino." Craig himself had been living in Florida for some years. He was captured on a vessel coming from there, and taken to Key West, whence by some mistake he was brought here, and was here discharged by the authorities. He testified that he had

shipped on the vessel to go to Havana, and meant to leave her there, and that if he could not have got his wife out from Florida, he should have gone to her if he could; that his parents lived in New Jersey, and that while he was with them a sister of this man Conley applied to him to take a note to her brother, but said nothing about any baby's dress; that his valise was packed by his parents, and sent to him on board the vessel; that he had not opened it, and did not know of the package for Conley until the valise was searched on board the vessel by the custom-house officers, and that no one on the vessel knew of his intention to go farther than to Havana.

The government gave evidence to show that the vessel was fitted to run the blockade, and the claimant gave evidence to show that she was fitted to run among the West India Islands or anywhere on short voyages. The claimant proved the payment by him of the purchase-money for the vessel. The bill of sale of the vessel, signed by the United States marshal of Florida, however, left the name of the purchaser in blank. A custom-house officer testified that one day, on the dock, he met the claimant, and spoke to him about having bought the vessel, and that the claimant said he did not own her. This, however, was positively denied by the claimant. Evidence was also allowed, under the claimant's objection, of statements in reference to the ownership of the vessel by third parties, which were made not in presence of claimant or any of his agents.

The government claimed that the vessel was forfeited on several grounds, viz.: that she was not really owned by claimant, but by residents of the insurrectionary states; that she was not bound, as she purported to be, on a voyage to Havana, Nassau, and back to New York, but was really intended to run the blockade; that she was conveying the liquors and the wagon to residents in the rebel states; that the baby's dress was certainly proceeding thither, and that the conveyance of that by her even to Havana was sufficient to forfeit the vessel. It was urged by the claimant that the evidence showed that he was the only owner of the vessel and the whole cargo, and that she was bound upon the voyage for which she had cleared; that there was no proof that any of the goods were going to the rebel states in the vessel, and no proof that the claimant had any knowledge of the presence on board of either the Masonic books or the baby's dress, and that a vessel could not be forfeited by the presence on board, without the knowledge of her owner or master, of articles which some other person might have put on board with a design to send them ultimately by another conveyance to the rebel states, but that either she must be herself proceeding thither, or must have articles on board known to her owners to be proceeding thither.

The District Attorney and Webster & Craig, for the United States.

Benedict, Burr & Benedict, for claimant.

BETTS, District Judge, after stating the pleadings in the case, thus proceeded:

The determination of this case depends upon a minute tissue of indirect and inferential evidence spread out before the court in extended statements, verbal and written, elaborated and expounded by counsel with great ability and earnestness. Whichever conclusions may be adopted by the court on the multiplex and very dubious reliability of no inconceivable [inconsiderable] portion of the evidence, there is little probability that the parties will be inclined to receive the decision as a finality in the case, it being, moreover, almost a pioneer in this class of prosecutions. On finishing the study of the cause accordingly, I deemed it excusable to forbear the task of collecting, analyzing and collating the mass of proofs furnished in the suit, and vindicating with exactitude the deductions adopted by the court. The course will rather be to declare with perspicuity the result of my views of the case, as it stands before me, and have it abide the ultimate judgment of the higher courts upon the solidity of the considerations which governed the present determination.

I therefore declare: First, that the statute referred to is positively prohibitory to citizens or residents alike, in the loyal and insurrectionary states during the existing war, from all intercommercial intercourse and dealing, with a view to reciprocity of gains, or in manifestation of feelings of amity and aid toward each other, either in acts of material support or friendly encouragement to the benefit of the enemy. The property intended to be used to those ends, and the vehicle employed to convey it, gratuitously or for profit, are alike confiscable, if seized proceeding to effect such purpose. The absolute culpability of the property is independent of all questions of contraband or blockade. If, then, any of the cargo of the Josie was on its way to be delivered within the rebel states, it would fall within the interdiction of the law, without regard to its intrinsic value or adaptation to belligerent uses, or the degree of progress made in completing the object of the parties concerned in the attempt.

Second. I think there is reasonable ground of suspicion, amounting to prima facie proof, arising out of the evidence before the court, that the ownership of the vessel itself was not really and honestly acquired by Eneas, the claimant, nor was it intended that the title should be vested in his name, or that she should be authoritatively controlled by him or any actual loyal owner. This evidence is strengthened by proof of declaration made by Eneas on the subject, by the appearance of the document exhibited as evi-

dence of his title, and other incidental particulars attendant upon the transaction.

Third. I regard the evidence, considered as a totality, as presenting a case of reasonable suspicion that all the goods and property on the vessel when she was arrested had previously been obtained for the use and enjoyment of inhabitants or persons then residing in or belonging to the insurrectionary states, and was, when seized, proceeding to their use and aid.

Fourth. So, also, in my opinion, the proofs, from a reasonable and grave ground of suspicion and uncontradiction, amount to prima facie evidence that the wagon and harness, the liquors procured and shipped on board the vessel, and other items put in her charge, were severally the property of rebels, and were seized in the act of proceeding to sea to the use and aid of residents in the insurrectionary states, with the knowledge of the claimant of the vessel, and furthermore, as before suggested, reasonable cause of belief is created by the proofs that the vessel herself is enemy property, or was placed wholly at his use and benefit by means of the transactions connected with her purpose and dispatch on this voyage.

Fifth. In my opinion, the evidence adduced by the claimant does not so obviate the force of the proofs given on the hearing for the libellant, as to prevent its legal effect of exacting the condemnation of both vessel and cargo.

Judgment of condemnation and forfeiture accordingly ordered.